ZEBULON H. KING ET AL. *v.* THOMAS W. ELSON ET AL.

The court charged the jury to find for the plaintiffs, if they had shown a regular title to the land from the state, which they did, unless the defendants had shown a superior outstanding title under which they claimed. This was error. The defendants, under the plea of not guilty, had the right to set up the superior outstanding title, although they did not claim under it. (Paschal's Dig., Art. 5307, Note 1153.)

To prove the outstanding title, the defendants read in evidence the *testimonio* or second original issued to the party, which was read under an agreement that it was issued by the commissioner, but that the original or archive was never filed in the general land office, as contemplated by statute. (Paschal's Dig., Arts. 69, 70, 71, Notes 250, 251.) It was also proved that the *testi-*

*monio* was never recorded, nor were the lines marked, nor had the land been designated on any map, nor was the grant of general notoriety in the country, nor was there proof that the patentee, under the location, had any notice of the grant when the location was made; nor was there evidence by either party to show that any protocol, matrix, first original, or archive, ever existed, or ever was or was not in the general land office: *Held*, that an agreement, "that the original was never *filed* in the general land office," was not an agreement that it is not an archive there, whatever may have been the intention of the parties.

Upon this evidence and this mere absence of evidence the court instructed the jury according to the rulings in Guilbeau v. Mays, 15 Tex., 410, as modified in Musquis v. Blake, 24 Tex., 461; Nicholson v. Horton, 23 Tex., 47; Word v. McKinney, 25 Tex., 258; Wilson v. Williams, 25 Tex., 54: *Held*, that had there been evidence that the protocol of Acosta's eleven-league grant was not in the general land office when appellee's survey was made, in the light of these decisons no objection could be made to the charge. (Paschal's Dig., Arts. 4980, 4981, 4983, Notes 251, 1090, 1092.) But upon the case made the instruction was calculated to mislead; and, at any rate, the verdict was not supported by the evidence.

If the *testimonio* be found in the hands of the party, the presumption is that the protocol is in the general land office; and, if it be there, it is notice to subsequent locators, whether it was delineated on the map or not. (Paschal's Dig., Arts. 70, 71, Notes 250, 251, 974.)

The chief justice reviewed the case of Guilbeau v. Mays, (15 Tex., 410,) and the subsequent cases, on the subject of unrecorded and unknown grants over which there have been subsequent titles perfected, and expressed his individual non-concurrence in the doctrine; and he said, that, should he hereafter follow them, it would be out of respect to the maxim "*stare decisis*," and not because he would admit the soundness of the principle.

Appeal from Anderson. The case was tried before Hon. L. W. Cooper, one of the district judges.

There was no question about the plaintiff's title, or the exact extent of the conflict with the supposed outstanding grant of Acosta. The plaintiffs claimed under the patentee; the defendants did not claim under the Acosta grant, but set it up as an outstanding title; and the case was made to turn upon the question as to whether Jones, the original patentee, from whom plaintiffs derived title, had notice of this unrecorded grant, or was put upon reasonable inquiry in regard to it.

Thomas W. Elson, Robert B. Templeman, and A. E.

McLure and wife, sued Zebulon H. King, John Mosely, and William C. Daniel, in an action of trespass to try title.

The legal title of the plaintiffs below was admitted. They held under a patent. The plea was not guilty, and under that plea the defendants (appellants) set up an outstanding title in one Juan N. Acosta, of an older date than the patent under which plaintiffs (appellees) claimed in the suit below. The survey on which the patent issued, under which the appellees claimed and brought suit, covered about two hundred and fifty or three hundred acres of the Acosta grant, and this was in fact the true amount in controversy between the parties, the appellants setting up no claim or title to the remainder of the land mentioned in the petition.

The original protocol, granting the eleven leagues to Acosta, is not on file in the general land office, but the *testimonio* granted to him was read on the trial, its genuineness being admitted. The *testimonio* had not been recorded, nor placed on the records of the general land office, as was admitted by the written agreement of the parties, set out in the opinion. Thus it will be seen that the *testimonio* is of older date than the patent, but it was unsupported by a first original, or an archive in the general land office; and the question was as to the effect of an unrecorded *testimonio* for which there was no corresponding grant in the general land office.

The *testimonio* read showed that the land had been surveyed and witness-trees marked; and one of the errors assigned, and also the exception taken to the ruling of the court, is, that the defendants below moved the court to instruct the jury that if they believed, from the evidence, that the land had been surveyed and the lines marked, it would put the subsequent locator on his guard. This is the substance of the charge, and it was refused, and the court instructed the jury in accordance with the doctrine in Guilbeau v. Mays, 15 Tex., 410.

The jury having returned a verdict for the plaintiffs to the extent of the conflict, there was a judgment, from which the defendants prosecuted error. The further history of the case is fully set forth in the record, and the more critical facts are set out in the argument of Mr. *Reeves.*

*T. J. Ward,* for appellants, discussed the case of Guilbeau v. Mays, 15 Tex., 410, and the subsequent cases, qualifying the principle. (Hollingsworth v. Holhousen, 17 Tex., 47; Love v. Barber, 17 Tex., 312.)

*R. A. Reeves,* for appellees.—It was admitted on the trial, as shown from the agreed statement of facts, that the appellees, who were plaintiffs in the district court, have a regular chain of title from Jones, the original grantee, down to themselves, and that their deeds have been regularly recorded. The lands claimed by the plaintiffs (appellees) were patented to William Jones, assignee of Richard B. English, in November, 1851, and the patent was recorded in Anderson county in 1852.

The evidence on the trial did not show the extent of the conflict between the titles, but it was agreed that the lands claimed by the defendants, (appellants,) as covered by the *testimonio,* were about two hundred and fifty or three hundred acres, and that they set up no claim to the balance, covered by the patent to William Jones.

The defendants produced no title in themselves to any portion of the land covered by the Acosta grant, but the defense, as will appear from the proceedings, was made to consist in the alleged want of a good title in the plaintiffs, and an effort to show an older and better title in Acosta, and that William Jones, the party under whom the appellees claim, had notice of this title.

Their right to prove an outstanding and better title in Acosta is not controverted, but to make the defense available, something more must be done than to prove an older

grant. There must be proof that the title was filed in the general land office, or recorded in the county where the land is situated, or described on the map of the county or land office. It was admitted that the Acosta title was never filed in the general land office, and there was no evidence that this title had ever been recorded anywhere, nor delineated on any map, or that Jones had notice of the grant, or that he or any one else, by any diligence, could have ascertained the existence of any such grant. There was no proof of an actual survey; on the contrary, the witness Green, introduced by the defendants, proved that he had never seen any marked lines. The effort to prove that Jones knew that the land was covered by the *testimonio* was equally unsuccessful, and the evidence is that he believed his title was a good one.

The grant to Acosta in 1830 is for eleven leagues, in two divisions; five are described as situated on the Navasota creek, and the other six leagues on the Trinity river. The five leagues on the Navasota are described as joining below the five leagues of Don Mariano Riva Palacios, on both sides of the creek, and above the eleven leagues of Don Andres Varda, and begin from the northwest corner of said five leagues of Palacios. The other six leagues are on both banks, right and left, of the Trinity river, joining below the six leagues of Don Mariano Palacios, and above three leagues surveyed for Yoride Jesus Grande, and begin from the northwest corner of Palacios.

There was no evidence that the lands of Palacios, Varda, or Grande, called for in the Acosta grant, were known or could be identified, nor that Acosta ever exercised acts of ownership over the lands granted him. And there being nothing to put Jones on inquiry, he and the plaintiff holding under him must be regarded as innocent purchasers, without notice, according to the ruling in Guilbeau v. Mays *et al.*, 15 Tex., 410. In that case the court says: "You may, if you think proper, put your title in your trunk, without

having it recorded, but if you do so, and an innocent pur-
chaser should buy the same land from the person or the
sovereignty possessing the original titles, your elder title
must and will give way to the junior title."

The instructions asked by the defendants were embraced
in the charge given by the court, except the third and last
one, and that was properly refused. The court was asked
to charge the jury that if they believed, from the evidence,
that the landmarks around the survey of Acosta were so
plainly marked as to put a prudent person on inquiry, it is
notice to subsequent locators, and the deed of Acosta need
not be recorded, if the landmarks were sufficient to put
the plaintiffs on inquiry.

There were no facts in the case to which this charge was
applicable. The proof failed to show an actual survey, and
the presumption is strong that there were no landmarks,
from the evidence of the only witness who was examined,
and that was that he saw no marked lines. No facts were
shown from which it could be inferred that the plaintiffs
or William Jones, under whom they claim, had notice of
the Acosta title. It was without notoriety, the location of
the land was not known, and no one to apply to for inform-
ation, and there was no error in refusing to charge on a
question about which there was no evidence—none cer-
tainly of any landmarks.

The facts in Guilbeau v. Mays *et al.* are very similar to
the facts in the present case, and the ruling of the court
is so directly in point, that it is deemed sufficient to refer
to that authority alone in support of the judgment of the
district court.

MOORE, C. J.—The jury were instructed, by the charge
of the court, to find a verdict for appellees, the plaintiffs
below, if they had shown a regular chain of title for the
land in controversy from the state down to themselves,
unless the appellants had shown by the evidence a superior

outstanding title, under which they claimed. The charge doubtless was hastily drawn, and given in the form found in the record through inadvertence. It is evidently erroneous. If there was a superior outstanding title for the land in suit, or any part of it, the appellants were undeniably entitled to set up such title as a defense to the action, although they made no claim to the land under such outstanding title.

To maintain the issue on their part, the appellants introduced in evidence the *testimonio* of a grant of eleven leagues of land to Juan Nepomucino Acosta, in respect to which the parties made the following agreement, to wit: "It is agreed, for the purposes of a trial, that the original *testimonio* was issued by Vincente Aldrete, the commissioner, &c., for the Mexican government, and that the same be read as evidence without further proof, but that the original *testimonio* was never filed in the general land office." The *testimonio* does not appear to have been recorded in the county where the land is situated; nor was there any evidence that the lines of the Acosta grant were plainly marked, or that it had been platted on the map in the district or county surveyor's office, or that the grant was of general notoriety in the section of country where the survey was made under which appellees claim, or that the party under whom they claim had any knowledge of such grant previous to the location and survey of his certificate. And there was no evidence adduced by either party showing what disposition had been made of the *protocol* or *matrix* of Acosta's grant, or from which it could be inferred that it was not on deposit in the general land office; for undoubtedly the agreement which we have copied, whatever may have been the intention of the parties, does not do so. On this state of the case the jury were instructed by the court in conformity with the ruling in the case of Guilbeau v. Mays, 15 Tex., 410, as explained and modified in the subsequent cases of Byrne v. Fagan, 16 Tex., 391; Musquis v. Blake,

24 Tex., 461; Nicholson v. Horton, 23 Tex., 47; Word v. McKinney, 25 Tex., 258; and Wilson v. Williams, 25 Tex., 54.

And had there been any testimony before the jury tending to prove that the protocol of Acosta's grant was not in the general land office when appellee's survey was made, in the light of these decisions no objection could be made to this charge. But it may be well questioned whether, in the facts before the jury, it was not calculated to mislead, rather than aid them in attaining a correct conclusion in their verdict. At all events, it must be held that the verdict rendered is unsupported by the evidence, and the motion for a new trial should therefore have been sustained.

In the case of Byrne v. Fagan, HEMPHILL, C. J., says: "But there was no proof that the original or protocol of the *testimonio*, offered in evidence by defendants, was not deposited in the general land office, and there is a presumption that, when there is a *testimonio*, the original is among the archives of the general land office, being its proper place of deposit. Now, although an owner of lands should, in the exercise of vigilance, record his grants or patents, and would, perhaps, examine as to their proper delineation on the county maps, yet he is not, for his own security or for the preservation of his rights, compelled to the performance of these acts, provided his grant be deposited in the general land office. If it be found there, it is notice at least to the government, and those who claim under the government. Whether it be delineated on the county map or not, is a matter which cannot affect the grantee. To make this delineation is the duty of the officers charged with such functions, and their failure or neglect in discharging this duty cannot impair the rights of patentees."

That I may not, by the reference I have made to the case of Guilbeau v. Mays, and the subsequent cases modifying

it, be placed in a false attitude if I should hereafter be called upon to consider the questions discussed in them, I feel constrained to say, with the most profound respect for the great jurists who have given their sanction to the doctrine contained in these cases, that I have never been able to find anything in the statutes, prior to the last session of the legislature, or in our law of real property, to convince my judgment of their soundness, and should I feel constrained to follow them, if the question involved should come before me unaffected by the provisions of the act of the last session of the legislature on this subject, I should do so upon the ground of *stare decisis*, instead of a belief of their intrinsic correctness.

In the case of Guilbeau v. Mays, with which this doctrine had its origin, it is said that the failure of the grantee of the elder title from the government to record his title, or delineate the land on the maps, or give other notice, will postpone it to the junior title, and place the owner of the latter in the position before the courts of an innocent purchaser, and in principle not distinguishable from the great class of cases of innocent purchasers without notice of any prior or superior title. An examination of the able opinion in this case shows very plainly that the decision is rested mainly in the assumption that grants from the government, especially such as are referred to in the opinion, come within the provisions of the registration laws, and hence, if they were not recorded, the owner would be postponed in favor of a junior title. If this were the correct construction of the registration laws, and they are to be held to affect pre-existing titles, the conclusion would be unquestionable.

But it is emphatically held, in the cases of Byrne v. Fagan, Nicholson v. Horton, and Musquis v. Blake, that the failure of the grantee to record his title does not give the superior right to the junior grantee. It must now be conceded, therefore, that although such titles may be regis-

tered, it is not obligatory upon the owners that they shall be. It is the statutes requiring deeds and other instruments to be registered which have created "the great class of cases of innocent purchasers without notice of any prior or superior title." Can, then, the grantee of the elder title subject himself to the penalty imposed by these laws by omissions to which they have no reference? Most certainly he will not. If the owner of the land is to be postponed, it is not from an omission which subjects him, by the plain language of the statute, to such penalty, but it must be on general equitable principles, which forbid him from taking advantage of his · own wrong, or enforcing a claim or demand against one whom he has assisted to mislead. If this is so, each case would have to stand upon its peculiar facts, and it could scarcely be held, as a general rule, that the mere absence of the grant from the general land office should operate so disastrously upon the owner of such grant.

As is said by Chief Justice HEMPHILL, it is the duty of the officers of the government to make the delineation on the maps of all granted lands, and their failure to do so cannot affect the owners; and, says he, "if from such failure the grant is not delineated on the county map, the commissioner of the general land office might re-grant the land; but in the controversy between the two titles, the elder grant, if capable of identification, must prevail over the junior patent." A parity of reasoning leads to the conclusion that the title of the elder grantee, if otherwise susceptible of being established, should not be lost by the absence of the protocol from its proper place of deposit in the land office. It was the duty of the officers who had the custody of such instruments to deposit them there. It cannot be supposed that they were ever in the custody or under the control of the grantees. They are not required, or even permitted, by law, to place the *testimonios*, which alone went into their possession, in the office. Upon what rule or prin-

ciple, then, shall the owner incur the penalty of forfeiture of his land from his failure to register his *testimonio* in the office of the clerk of the county court, which otherwise was not required of him, merely through the default of the officers of the government to discharge their duty? This, as we have said, is not a statutory penalty, through failure to comply with a requirement prescribed by statute, but a rule depending upon principles of equity. It should only operate upon a party, therefore, who has been voluntarily in default. These instruments, which it is insisted must be recorded, it must be remembered, are frequently of many years' anterior date to the registration laws, and it must, in many instances, have been impossible for the holders to have had them probated and recorded before the land was appropriated under a subsequent title or location. If the owner is not required to register his title, how can it be held that his failure to do so shall subject him to a forfeiture of his land, because he has not deposited in the land office the protocol of his title, which was never subject to his control, or had his survey marked upon the map, though bound, as this court has decided, to do neither the one nor the other of these things?

It is also to be remembered, that the question under consideration is with reference to notice to enable subsequent locators to ascertain what land has been appropriated by previous grants and what still remains public domain. It is not a question of purchaser without notice, in any just conception of the subject. And therefore it was held, that the grants or patents from the government were not required by the registration laws to be recorded, in order to protect the holder of the older title.

What possible service, then, will the registration of the different grants from the government in the clerk's office be to persons seeking for vacant land? A moment's reflection must satisfy any one that it can afford him no assistance. The mere inspection of a mass of titles can furnish

no guide in discriminating vacant from appropriated land. How many titles are there now in the general land office whose locations cannot be told even in the office, because not yet platted on the map? The mere deposit of one of these titles in the office, as the court holds, relieves the owner from the necessity of recording. Yet shall the failure in the mere useless act, so far as the subsequent location is concerned, of registering the title, work a forfeiture, because the grant is not thus filed in the general land office? It must also often have been the case that the owners of such grants were, after all reasonable diligence, unable to learn in what county their lands were situated, until after locations had been made upon them.

Much more might be said; but as I intended simply indicating my views upon the question, and not to enter into an elaborate discussion of it, I refrain from its further consideration. It will, of course, be understood, in what I have said on this subject, I express merely my own opinions, and do not attempt to speak for the court or any other member of it.

For the error in the charge indicated, and the refusal to grant a new trial, the judgment is reversed, and the cause

REMANDED.